**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 22-1168**

─────────

PATTI H. MENDERS, on behalf of herself and her minor child R.M; SCOTT MINEO, on behalf of himself and his minor child A.M; JANE DOE #2, on behalf of herself and her minor child,

　　　　　Plaintiffs - Appellants,

and

JANE DOE #1, on behalf of herself and her three minor children; JANE DOE #3, on behalf of herself and her minor child,

　　　　　Plaintiffs,

v.

LOUDOUN COUNTY SCHOOL BOARD,

　　　　　Defendant - Appellee.

─────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge. (1:21−cv−00669−AJT−TCB)

─────────

Argued:  December 8, 2022　　　　　　　　　Decided:  April 14, 2023

─────────

Before NIEMEYER, AGEE, and QUATTLEBAUM, Circuit Judges.

─────────

Vacated and remanded with instructions by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

─────────

**ARGUED:** Daniel Robert Suhr, LIBERTY JUSTICE CENTER, Chicago, Illinois, for Appellants.    Andrew Paul Selman, HANEY PHINYOWATTANACHIP PLLC, Richmond, Virginia, for Appellee. **ON BRIEF:** Jeffrey D. Jennings, LIBERTY JUSTICE CENTER, Chicago, Illinois, for Appellants.    Stacy L. Haney, HANEY PHINYOWATTANACHIP PLLC, Richmond, Virginia, for Appellee.

———————

2

QUATTLEBAUM, Circuit Judge:

The Loudoun County Public Schools (the "LCPS") developed and implemented a "Student Equity Ambassador Program" "to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination." J.A. 24. Under the program, Student Equity Ambassadors—selected by the LCPS— participate in "Share, Speak-up, Speak-out" meetings where they discuss issues of race and equity. The program also seeks to document incidents of perceived bias through a "Share, Speak Up, Speak Out: Bias Reporting Form." This electronic form allows students to anonymously report incidents of perceived bias for discussion at the Share, Speak-up, Speak-out meetings. It also allows students to request that school administrators investigate the reported bias incidents.

In response, the parents of several children who attend the LCPS sued the Loudoun County School Board (the "School Board") on behalf of their minor children, asserting Equal Protection and First Amendment claims. They allege that their children are not eligible for the Student Equity Ambassador Program because of their race and viewpoint. And they assert the reporting system that uses the Share, Speak Up, Speak Out: Bias Reporting Form chills their children from exercising their free speech rights.

The district court granted the School Board's motion to dismiss the parents' claims under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, concluding that the parents failed to allege plausible claims concerning the Student Equity Ambassador Program. And the district court concluded that the parents lacked standing to bring First Amendment claims over the new bias reporting system. The parents appealed.

3

The parents lack standing to challenge the Student Equity Ambassador Program. Their children never applied to be ambassadors nor even expressed an interest in participating in the program. As such, they suffered no injury in fact sufficient to confer Article III standing. So, we vacate and remand with instructions to dismiss those claims. But the parents plausibly allege that implementing the new reporting system chilled their children's speech to support their First Amendment claims. So, we vacate the district court's order dismissing those claims and remand for those claims to be considered on the merits.

## I.

As we must, in reviewing an order granting a motion to dismiss, we accept the following facts from the amended complaint and the incorporated exhibits as true and draw all reasonable inferences from them in favor of the parents. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *Annappareddy v. Pascale*, 996 F.3d 120, 127 (4th Cir. 2021).

## A.

In June 2019, the School Board engaged the Equity Collaborative, an outside consultant, to assess the "campus climate" within the LCPS. J.A. 14. The resulting report observed that "[t]here are limited opportunities for Black/African-American and Muslim students to convene in a network of social and cultural support." J.A. 14 (alteration in original). So, it recommended the LCPS "[e]stablish student affinity groups at all levels to support the social and cultural identities of students of color." J.A. 14 (alteration in

4

original). Such groups, the report continued, would "serve[] as a network of care for the marginalized student populations and establish[] a safe place for students to unpack feelings and emotions in times of social or cultural conflict." J.A. 48.

About one year later, the LCPS published its "Action Plans to Combat Systemic Racism." J.A. 65. The plan included the Student Equity Ambassador Program. Under the program, the LCPS selects two to three students from each middle and high school in Loudoun County to be "Student Equity Ambassadors." Student Equity Ambassadors participate in district-wide "Share, Speak-up, Speak-out" meetings where the students discuss issues of race and equity.

Initially, the LCPS limited the Student Equity Ambassador Program to "Students of Color." J.A. 110. But in response to criticism, the LCPS eliminated that requirement. In its place, the LCPS explained that "student leaders will be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice and inequity." J.A. 115. Student Equity Ambassadors, the LCPS advised, need to be honest, sympathetic, and have the potential for leadership. And they must "have a passion for social justice . . . ." J.A. 116. The LCPS publicized that applicants for the Student Equity Ambassador Program should "want to be a Voice for Social Justice," be "interested in Amplifying the Student Voice of Color" and strive to represent "Peers of Color by sharing their experiences." J.A. 117. So, despite eliminating the requirement that Student Equity Ambassadors be students of color, the program still "focus[ed] on race" and "recogniz[ing] students who have been marginalized." J.A. 116.

5

The parents allege that their children do not qualify for the Student Equity Ambassador Program as originally conceived or as practically implemented because they are not students of color and their views about important public issues "conflict with LCPS's definition of social justice." J.A. 24. The parents are also concerned that if "their students share their views about political or social issues, including those touching on [Critical Race Theory], religion, race, human sexuality, and other controversial political issues, they will be reported and investigated for 'bias incidents'" in connection with the "Share, Speak Up, Speak Out: Bias Reporting Form." J.A. 25. That online form allows students to anonymously report incidents of perceived bias, which include "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation." J.A. 22; J.A. 126. Such a report, investigation or public disclosure, they maintain, "could negatively impact their students' standing in the school community and ruin their college or career prospects." J.A. 25.

B.

The parents, on behalf of their children, sued the School Board under 42 U.S.C. § 1983, challenging the constitutionality of the Student Equity Ambassador Program and the system of reporting bias incidents with the "Share, Speak Up, Speak Out: Bias Reporting Form." In their amended complaint, the parents assert five claims. The first three relate to the Student Equity Ambassador Program. The parents allege the program violates the Fourteenth Amendment's Equal Protection Clause because it discriminates on

6

the basis of race; the First Amendment because it discriminates on the basis of viewpoint; and the Equal Protection Clause because it discriminates on the basis of viewpoint. The last two claims relate to the LCPS's new system for reporting perceived bias through the Share, Speak Up, Speak Out: Bias Reporting Form. The parents allege the LCPS's use of the bias reporting form violates the First Amendment by chilling speech through content-based speech restrictions and viewpoint discrimination.

The School Board moved to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the motion. It first addressed the Equal Protection claims. As for the parents' race-based Equal Protection discrimination claim, the district court held that the parents failed to plausibly plead that the LCPS enacted the Student Equity Ambassador Program with discriminatory intent or that it had a discriminatory impact. With respect to the parents' Equal Protection viewpoint discrimination claim, it determined that the Student Equity Ambassador Program is a non-public forum that only needs to be rationally related to a legitimate government purpose. The court then held that the program satisfied this test because the selection criteria for participation in the program—which it held did not require any substantive viewpoint— were rationally related to the legitimate government purpose of promoting a more inclusive, non-discriminatory environment. And the court reasoned that even if the program's requirement for a "passion for social justice" involves a substantive viewpoint, our *Buxton v. Kurtinitis*, 862 F.3d 423 (4th Cir. 2017) decision permits the LCPS to take viewpoints expressed by students into account when choosing between candidates in a competitive process.

The district court then addressed the First Amendment claims about the Student Equity Ambassador Program. Dismissing the First Amendment viewpoint discrimination claim, the court held the allegations that the Student Equity Ambassadors must have a passion for social justice did not plausibly allege the program "imposes a particular viewpoint to participate in the program in violation of the First Amendment." J.A. 143. And alternatively, the court stated that even if the program's selection criteria referenced a particular viewpoint, the allegation fails to state a plausible First Amendment violation because, again citing *Buxton*, it is part of a competitive selection process to allocate a limited number of slots and because of the "clear pedagogical concerns over which the [Student Equity Ambassador] program was adopted." J.A. 143.

Last, with respect to the parents' First Amendment claims regarding the system of reporting bias incidents through the new Share, Speak Up, Speak Out: Bias Reporting Form, the district court held that the parents lacked standing to bring these claims because they did not allege that there have been any disciplinary actions taken as a result of the bias incident forms. And the court suggested that any self-censorship on the part of the students "would exist separate and apart from the Bias Reporting system." J.A. 145. The parents timely appealed.

## II.

The parents argue the district court erred in dismissing their Fourteenth Amendment equal protection claims and First Amendment free speech claim based on the Student

8

Equity Ambassador Program. But before considering the merits of these arguments, we must first determine if the parents have Article III standing to sue in federal court.

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The limitation of federal court jurisdiction to actual cases or controversies is a bedrock principle fundamental to our judiciary's role in our system of government. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "One element of the case-or-controversy requirement is that appellees, based on their complaint, must establish that they have standing to sue." *Id.* To establish standing, a plaintiff must "show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). In other words, to satisfy Article III, a plaintiff must have a sufficient "personal stake" in the alleged dispute and have an alleged injury that is particularized as to him. *Raines*, 521 U.S. at 818 (internal quotation marks and citation omitted). Under Article III:

> [F]ederal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions.

*Ramirez*, 141 S. Ct. at 2203. We may only resolve real controversies with real impact on real people. *Id.*

9

In fairness, the esoteric nature of discussions about standing might lead one to conclude the topic is best reserved for law school faculty lounges. But we should not overlook the importance of this principle. The requirement of standing furthers the separation of powers between the three branches of our government. Under the Constitution, a party's grievance without an injury in fact does not confer standing and "does not state an Article III case or controversy." *Lujan*, 504 U.S. at 574. As a result, federal courts have no power to address them.

A recent Supreme Court decision illustrates this point. In *Carney v. Adams*, 141 S. Ct. 493 (2020), a Delaware lawyer challenged a Delaware state constitutional provision that required judicial appointments to reflect a partisan balance under the First Amendment's freedom of association clause. *Carney*, 141 S.Ct. at 496. But the lawyer had not previously applied to become a judge. The Supreme Court held that the lawyer did not have standing to challenge Delaware's party-membership requirement for the judiciary because he did not show that he was likely to apply to become a judge if he was not barred from doing so because of the party-membership requirement. *Id.* at 500. Absent that, the Court concluded he was not "able and ready" to apply. *Id.* at 501. Instead, he suggested merely "an abstract, generalized grievance, not an actual desire to become a judge." *Id*; *see also Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding contractors suing over the set-aside of certain state contracts based on race had standing to advance an equal protection claim because they were "able and ready" to bid on the contracts).

10

Much, like the lawyer in *Carney,* the parents here have not alleged facts that show their children were "able and ready" to participate in the Student Equity Ambassador Program. Despite the parents' objections to the program, they do not allege their children applied for or even wanted to be a Student Equity Ambassador. They certainly do not allege that any of their children were prevented from participating in the program. What's more, the parents do not allege they sought or wanted a separate program more aligned with their alleged viewpoints. So, even accepting the parents' allegations that the program erects a racially- or viewpoint-discriminatory barrier as true, they have not alleged an injury-in-fact.[1]

Instead, the parents' allegations sound much more like general disagreements with the School Board's implementation of the Student Equity Ambassador Program. The program, they insist, is part of a concerted effort to indoctrinate LCPS children with a certain viewpoint. But whether that is or is not a legitimate concern, it is a concern about policy. And concerns about policy should be made to policymakers, not judges.

---

[1] True, the First Amendment claim challenging the program in this case is not exactly the same as the one in *Carney*. *Carney* involved a First Amendment freedom of association claim whereas the parents maintain that the Student Equity Ambassador Program violates the First Amendment because it discriminates on the basis of viewpoint. But that distinction makes no difference here because, in their pleadings, the parents alleged that the injury or harm caused to their children by the Student Equity Ambassador Program's viewpoint discrimination was that it disqualified their children from being ambassadors. In that claim, they allege that the First Amendment is almost an Equal Protection clause for ideas. We are not aware of any authority finding standing for such a challenge without allegations that the plaintiffs were "able and ready" to participate.

Thus, we hold that the parents fail to establish an Article III injury. As a result, we lack jurisdiction to reach the question of whether the parents state a claim for violation of the Fourteenth Amendment's equal protection clause and for violation of the First Amendment's free speech clause as to the Student Equity Ambassador Program. Accordingly, we vacate the district court's judgment in favor of the School Board and remand for the district court to dismiss the action without prejudice. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing . . . must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").

III.

Last, the parents assert two claims based on the Share, Speak Up, Speak Out: Bias Reporting Form. According to the parents, the bias reporting form constitutes a system that violates the First and Fourteenth Amendments by chilling their children's speech through content-based restrictions and through viewpoint discrimination. Like the district court, we consider these causes of action together.

As noted above, the district court dismissed these claims for lack of standing. It explained that the parents failed to allege that there have been any disciplinary incidents launched as a result of the reporting form or even bias incidents recommended for investigation.[2]

---

[2] Further, the district court found that the parents did not allege that this new reporting system presented any greater risk of discipline than the LCPS's existing system.

Establishing standing in First Amendment claims alleging the chilling of free speech, however, is not that demanding. In *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947 (1984), the Supreme Court recognized the "danger of chilling free speech," explaining there is a possibility that, rather than risk punishment for conduct in challenging the statute, one "will refrain from engaging further in the protected activity." *Id.* at 956. Following that guidance, we have clarified that in "First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'" *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (internal citation omitted).

But not just any alleged chilling of speech will do. A plaintiff must allege that he or she has "experienced a non-speculative and objectively reasonable chilling effect" on speech. *Id.* at 236 (noting that a claimant need not show he ceased activities altogether to show an injury in fact). There are two ways plaintiffs can establish standing to pursue a First Amendment claim. "First, they may show that they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a 'credible threat' that the policy will be enforced against them when they do so." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (citation omitted). Second, they may make a sufficient showing of self-censorship, establishing a chilling effect on their free expression that is objectively reasonable. *Id.*

With these principles in mind, we review the parents' allegations. The parents first discuss the contents of the form and the process for reporting a bias incident. And as

13

described above, the parents allege Student Equity Ambassadors defined microaggressions as "'everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups.'" J.A. 23. They allege that the Student Equity Ambassadors cited denials of racial reality and a framework of "colorblindness" that sees people as individuals rather than members of a race as examples of microaggressions. J.A. 23. Then the parents address the reasons the bias reports have chilled their children's speech. They allege that their children "believe that everyone is equal and that we should strive for a color blind society." J.A. 24. The parents also allege that the children "wish to speak out on [Critical Race Theory], race, and gender identity, and other controversial political issues within the LCPS community," but that their views are not shared with others in the community. J.A. 25. As a result, the parents allege they "are concerned that if their students share their views about political or social issues, including those touching on [Critical Race Theory], religion, race, human sexuality, and other controversial political issues, they will be reported and investigated for 'bias incidents.'" J.A. 25.

We must accept these allegations, and all reasonable inferences from them, as true. And we must construe those allegations in the light most favorable to the parents. Applying that standard, these allegations are sufficient to show that the bias reporting system caused the parents' children to experience a non-speculative and objectively reasonable chilling effect on their speech. The parents allege that their children desired to speak about specific issues—"political or social issues, including those touching on [Critical Race Theory], religion, race, human sexuality, and other controversial political issues." J.A. 25. They

14

allege their children's views plausibly fell within what Student Equity Ambassadors in presentations about the program defined as microaggressions. And the parents allege that their children refrained from speaking on these issues because they feared that, if they did, fellow LCPS students would accuse them of bias and the LCPS would investigate the reports. Finally, they allege any such report, investigation or public disclosure could harm their standing in the school community and ruin their college or career prospects.

These allegations are sufficient to meet our standing requirements. Thus, we vacate the district court's dismissal of the parents' claims that the reporting system the LCPS implemented using the Share, Speak Up, Speak Out: Bias Reporting Form violates the First and Fourteenth Amendments by chilling their children's speech through content-based restrictions and through viewpoint discrimination. Without expressing a view on the merits, we remand for the consideration of these claims on the merits and for further action consistent with this opinion.

## IV.

Federal courts are not empowered by the Constitution to resolve policy disputes. Article III of the Constitution only confers jurisdiction to resolve cases and controversies. And for there to be a case or controversy, the party asserting a claim in federal court must have suffered an injury in fact. The parents' claims challenging the Student Equity Ambassador Program do not allege an injury in fact. Thus, we vacate the district court and remand with instructions to dismiss those claims without prejudice for lack of jurisdiction. But the parents have sufficiently alleged a particularized, concrete injury required for

15

standing to challenge the reporting system that includes the perceived bias forms. Accordingly, we vacate and remand for the district court to consider the parents' First Amendment claims based on the bias reporting system in the first instance.

*VACATED AND REMANDED WITH INSTRUCTIONS*